## UNITED STATES *v.* HEWITT.

*(District Court, D. New Jersey.* February 23, 1882.)

CRIMINAL LAW—WITHHOLDING PENSION MONEY.

Where the agent or attorney of a pensioner collected the pension money, and by the consent and at the request of the pensioner, in good faith, retained sufficient of the money in his hands to pay certain debts due by the pensioner to certain parties, and also retained $200 for his professional services rendered for the pensioner in other matters not connected with the procurement of the pension money, there is not such a retention of pension money as is contemplated in the offence described in section 5485 of the Revised Statutes.

*The District Attorney,* for the prosecution.
*Mr. Wescott, Mr. Harned,* and *Mr. Crandall,* for the defence.

NIXON, D. J., *(charging jury.)* With the legislation of congress to raise and support armies for the suppression of the rebellion against the government of the United States began, also, legislation for the relief of those who were injured, and for the support of the families of those who were killed in the service. As these beneficiaries of the nation were generally from the humbler walks of life, and ignorant, it soon became necessary to enact laws for their protection against a class of men called "pension agents," who too often used their position in prosecuting the claims of pensioners to enrich themselves at the expense of the unfortunate persons who were the objects of the bounty of the government. Accordingly, on the fourteenth of July, 1862, an act was passed which made it an indictable offence for an agent or attorney, directly or indirectly, to demand or receive any greater compensation for his services in procuring a pension than $5 for preparing or filing a declaration by the applicant, and $1.50 for any additional affidavits required by the commissioner of pensions, or who shall wrongfully withhold from a pensioner or claimant the

whole or any part of the pension or claim allowed or due to such pensioner or claimant. Various other acts were passed from time to time, having the same general objects in view, until 1873, when the law now in force was approved, and which stands on the Revised Statutes of the United States, in section 5485, as follows:

"Any agent or attorney, or any other person, instrumental in prosecuting any claim for pension, * * * who shall directly or indirectly contract or demand or receive or retain any greater compensation for his services, or instrumentality in prosecuting a claim for pension, * * * than is provided in the title pertaining to pensions, or who shall wrongfully withhold from a pensioner or claimant the whole or any part of the pension or claim allowed or due such pensioner or claimant, * * * shall be deemed guilty of a high misdemeanor, and upon conviction thereof shall, for every such offence, be fined not exceeding $500, or imprisoned at hard labor not exceeding two years, or both, at the discretion of the court."

That is the section under which this defendant was indicted. As it was passed in 1873, you observe in the first part of the section this provision: "that any attorney or agent who shall directly or indirectly contract or demand or receive or retain any greater. compensation for his services in prosecuting a claim for pension than is provided in the title pertaining to pensions, shall be guilty," etc. This has reference to a section then standing under the head of pensions, to-wit, section 4785. The limit of the charge to be made for *services* (not, I suppose, including necessary actual *expenses*) was then found in section 4785 of the Revised Statutes, which declares that no agent or attorney shall demand or receive any other compensation for his services in prosecuting a claim for a pension than such as the commissioner of pensions shall direct to be paid to him, not exceeding $25. The law thus stood until June 20, 1878, when another act was approved limiting the charge for services in pension cases to $10, and expressly repealing section 4785. The repeal of this section having created a difference of opinion in the courts as to whether an indictment could be maintained under this clause of section 5485, which forbids a greater compensation than was provided for in the title of the Revised Statutes pertaining to pensions, congress put the question at rest by enacting on the third of March, 1881, that the provisions of section 5485 should be applicable to any person who violates the provisions of "the act relating to claim agents and attorneys in pension cases," approved June 20, 1878. This legislation is not without its difficulties, and the proper construction of the pension laws between June 20, 1878, and March 3, 1881, is obscure. The offence charged against this defendant in the first count of the indict-

ment was committed, if at all, between these dates; and it is doubtful whether there existed in the title of the Revised Statutes pertaining to pensions during that time any provision limiting the fee which any agent or attorney might lawfully demand or receive for his services.

The statute is a penal one and must be construed strictly. The defendant is entitled to the benefit of all doubts, and I must therefore hold that there can be no conviction under the first count of the indictment.

You will then, gentlemen, dismiss from your consideration the question of the guilt or innocence of the defendant under the first count, and turn your attention to the second count.

The second count substantially charges that the defendant, being the attorney of Benjamin Barnes in prosecuting a certain claim of said Benjamin for a pension under the laws of the United States in pursuance of pension certificate No. 166,663, issued to said Benjamin, and having received from the United States the pension money allowed to and due to said pensioner to the amount of $1,610.73, did wrongfully withhold from the said Benjamin a large part of said pension, to-wit, the sum of $500. The specific charge is that he unlawfully withheld pension money belonging to the pensioner. The uncontradicted proof in the case is that the defendant had been instrumental in procuring the pension; that these services had been rendered under a written agreement between him and the pensioner, approved by the commissioner of pensions, in which the fee for all the services should be $25, and that the $25 has been paid. All the money, therefore, which came to the pensioner was his money. It came to the hands of the defendant by a check from the department.

I won't say how—no matter how—the evidence seems to be that this man Starns took the check from the post-office, carried it down to Hewitt's office, and what took place you have heard the witnesses state. The evidence is that the pensioner came to the office of the defendant, and the question is, did he pay it over to the pensioner, or did he unlawfully withhold from him a portion of it?

Now, gentlemen, you have heard the testimony of the pensioner, Barnes, and also the statement of the defendant himself. You see how ignorant the former is; you heard what unfortunate habits he has contracted, and you know what allowance should be made for his conduct and his conversation. You also should not forget the terrible strain which a charge of this kind subjects the defendant to, and also what allowance should be made for his apparently contradictory stories

about the precise character of the relations of the parties and the nature of the transactions between them. This fact is conceded, to begin with: that about the first of May, 1880, the check of the pensioner, Barnes, came into the possession of the defendant for the amount of his pension money, to-wit, $1,610. That was the whole amount of the arrearage from January, 1863, up to the time the certificate was issued, less $25, which had been paid to Mr. Hewitt himself. It also seems to be conceded that the defendant had been instrumental in procuring this money for him.

It is also proved that the defendant procured the pensioner's indorsement upon the check,—the same being payable to his order,—and they told him that the check must go back to Washington. That is an uncontradicted fact in the case; repeated by Barnes himself at two different times, and not disputed by the defendant. Barnes had the right to infer from this statement,—being himself an ignorant man, and not knowing, as he said, the difference between a voucher and a certificate until they told him what the difference was,—he had a right to infer, then, how much money was due to him for the arrears upon his certificate, but there is no evidence that any one told him that the money had in fact been paid by the government. He thought that something further was to be done at Washington before he could get his money.

The defence is that on the arrival of the check the parties met, under the circumstances detailed by the witnesses, at the defendant's office and agreed—Barnes himself being there—as to the distribution of the money; that it was understood by Barnes that more than one-half should go to Starns, for an account which he had against him; that $200 should go to a grocer for a bill that Barnes had contracted, and another $200 to be retained by the defendant for other professional services, and that the residue of the whole amount was paid to the pensioner from time to time until all the money was exhausted. Now if this is true, gentlemen, although it is not, in my judgment, in compliance with the spirit, and certainly not with the letter, of the pension laws, it has much to do with the defendant's actual criminality.

The law required the defendant to give the check to the pensioner, and say to him, substantially: "I have received my pay of $25, and this money is yours, except so far as I have made myself liable to the grocer for your bill. Go to the bank with me, if you please, and get your money, and then we will come back here, and you will pay what you have honestly agreed should be expended in advance for your

support." That is what the law required this agent to say to Barnes. He did not take this course, but kept the money in his own hands. He says that in consequence of Barnes' habits and living, and at Barnes' request, the money, by agreement, was left in his hands. Barnes denies this, and says he thought he was getting the money as fast as it came from Washington. He was a very ignorant man; but Hewitt kept the money in his own hands, and made these payments in accordance, as he asserts, with the agreement and consent of the pensioner.

Now, I want the verdict of the jury upon this defence. I wish, therefore, when you go out, in the first place, you ask yourselves this question: Is it true, as alleged by the defendant and denied by the pensioner, that there was an agreement, to which Barnes assented, that one-half of this money—more than one-half—should go to Starns? Take all the testimony you have heard of the transaction and then inquire: Did Barnes ever agree, or did the defendant himself, at that time, have reason to believe that Barnes had agreed, that Starns should take the major part of this money for some bill which it is alleged he had against him? There is one difficulty about this view which is adverse to the defendant, but I must state it here, because we want all the facts. If that was the understanding at the time, how comes it that the defendant should be instrumental in drawing up a paper and getting Barnes to make his mark? Nay, more than that, why did he draw up an affidavit, and get Barnes to swear to it, that all this money which Starns got was given by the pensioner to Starns without any fear, force, or favor, collusion, or compulsion? Of course, gentlemen, if there is any collusion in this case between Starns and Hewitt, with regard to this poor man's money, then all this defence is a pretence. The question for the jury to decide is, why did Hewitt protect himself or protect Starns from a proper and honest transaction, as he supposed, by getting him to swear to something that was not true?

Now, the only reply to that is this: it might be that Hewitt did not believe that this money was *bona fide* due to Starns; he might have had some doubts about that, and he thought before he paid to Starns he would see whether the pensioner himself was willing to swear that this was a fair, free, and *bona fide* transaction, and not compulsion.

Then, the next point for you to consider is, was the retention of the $200 for professional fee in other matters in pursuance of an agreement with the pensioner? If this defendant performed professional

services which he was entitled to be paid for, and if this pensioner agreed to let him have it upon the coming of his money; if he agreed, knowing that the money was there, that Hewitt should retain $200 for these professional services,—then, in my judgment, there was no unlawful withholding. It was a debt that he owed—an honest debt. But if that was an after-thought on the part of the defendant to cover up the retention of $200 which he originally intended to have received for his services as a pension agent or attorney, that is for you to say. Now, what is the truth of that matter? Had this defendant, Hewitt, at the time of that settlement, performed such professional labor in other matters for this poor man that $200 was a fair and honest compensation for his labor, because there is no pretence that there was any contract as to the amount. Hewitt says that Barnes agreed he should retain it, and Barnes denies it. You have heard the testimony of all the witnesses. Is that an after consideration, or was it an agreement made at the time in good faith?

Now, I wish, gentlemen, you to consider this case in the light of the testimony and tell the court what your views are on those two points. If the evidence and law justify it, we all desire that the defendant should be acquitted.

Give the defendant the benefit of all reasonable doubts, and if, after careful consideration, you come to the conclusion that in point of fact this defence is made out, then bring in a verdict of not guilty. If, on the other hand, you think they have failed in that defence, it is your duty to convict him without regard to the consequences.

The defendant was acquitted.